JOHN HORNBACK'S ADMR. v. ADAM HORNBACK'S ADMR.

Resulting Trust — Purchase of Lands by One Appointed Committee of Lunatic.

    A. was appointed by the court committee of John Hornback, a lunatic, and purchased of B. lands, using money derived from a sale of lands of the lunatic made two years before he was so adjudged. The land purchased of B. was in the name of A., and deed made accordingly. *Held*, that though A. as committee of the lunatic was bound to receive the estate and manage same advantageously, applying the income, if sufficient for the purpose, to the support and maintenance of the lunatic, it would not be his duty to invest it in real estate, and if used in paying for land purchased for his own use and in his own name, a trust would not by the use of the money in that way result to the lunatic.

Same.

    One appointed a committee for handling the estate of a lunatic cannot escape liability for such property as may come into his hands as such committee, on the ground that the adjudged lunatic was sane and capable of managing his own affairs.

APPEAL FROM NICHOLAS CIRCUIT COURT.

June 29, 1867.

OPINION OF THE COURT BY JUDGE PETERS:

Whatever may in fact have been the mental capacity of John Hornback after he had been adjudged to be a lunatic, upon an inquisition held to inquire into the state of his mind, and his brother, Adam Hornback, at his own request, was appointed his committee, and proceeded to act in that character, neither he, nor his representatives, can escape responsibility for such estate of John, as came to his hands as his committee, on the ground that John was sane, and capable to manage his own affairs.

It is contended that the land purchased by Adam Hornback from William Holladay was paid for with the money received from Reed, for the land which John Hornback had sold to him, whereby a trust resulted to John, and that his heirs are consequently entitled to the land. If it be conceded that Adam used the money of John in paying for said land it would not follow that a trust resulted to John. As the committee of John, Adam was not

only the custodian of his person, but he was bound to receive such estate as he had and manage the same advantageously, applying the income, if sufficient for the purpose, to the support and maintenance of the lunatic, and if it consisted in money he might loan it out, or if he retained it and used it himself, he would in like manner be responsible for the interest, but it was not his duty to invest it in real estate; and if he used it in paying for land, which he purchased for his own use and in his own name, a trust would not by the use of the money in that way result to the lunatic. Consequently, appellants cannot be entitled to the land purchased of Holladay, besides, that purchase was made two years before Adam was appointed committee for John. This brings us to the inquiry: What estate, if any, came to the hands of Adam Hornback as committee of John? and this question presents some difficulty. It does not appear that John was possessed of any estate, unless Reed, who had purchased his land and his interest in the mills in Bourbon county, owed a part of the price which he had undertaken to pay for the land and mills.

It appears that Samuel Hornback, the father of John and Adam, had conveyed to the former 100 acres of land in Bourbon county at one time, and at another time an interest in a grist and saw mill. On the 11th of September, 1819, John Hornback and wife conveyed the 100 acres of land to John Reed in consideration of $2,500, all of which the grantors acknowledged to have been paid to them in land at the time the deed was made, and on the 24th of September of the same year, John Hornback conveyed to Reed his interest in the mill, in consideration of $200, acknowledged in the deed then to have been paid. Then conveyances were made, nearly three years before the appointment of Adam as committee of John, and there is no direct evidence that any portion of the price of the land or mills ever came into the hands of Adam. The jury, who found John a lunatic, stated in the verdict that his estate consisted of claims in the hands of those who had improperly gotten his property from him, and which they find to be worth about $1,850. Subsequently, actions were brought in the Bourbon Circuit Court for some slaves, to whom John had some claim, valued at even more than the amount of the claims referred to by the jury, but those suits were decided adverse to his claim and he got nothing.

Several witnesses, some four perhaps, testify to conversations had with John Hornback some thirty or forty years before the

time they testified, who stated that Adam said he used the money of John in paying for the land purchased of Holladay. Hook says that John himself purchased the land and paid for it by assigning a bond on Reed for $1,000. John Reed says he thinks the payments for the land his father purchased of John Hornback "fell into the hands of Adam Hornback," but he says that he could not, thirty years and upward afterward, state how money was paid and what conversations occurred.

Cottingham states that Adam Hornback came to him before he purchased the land from Holladay, and requested him to take a part of the land, saying he was not able to pay for all of it, but afterward told him he had concluded to buy all the land, that his brother John had some $1,800 or $2,500, which would come into his hands, and he would thereby be able to pay for all of it. This must have been, from the date of the purchase of the land, some three years before an inquisition was held on John, and it is not accounted for how Adam knew three years before the thing transpired that he would become John's committee.

The remoteness of the transactions from the period at which the witnesses testify, and the unsatisfactory character of the evidence, envelopes the whole claim in too much doubt and uncertainty to authorize judicial action.

Wherefore, the judgment is affirmed.

*Harlan, Starthon,* for Appellant.

*Davis,* for Appellee.